**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| OLUKAYODE ALABI OLAIFA, | |
| Plaintiff, | No. 18 CV 6801 |
| v. | Judge Manish S. Shah |
| ALEJANDRO MAYORKAS,* Secretary of the Department of Homeland Security, et al., | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Olukayode Olaifa, a native of Nigeria, came to the United States as a lawful permanent resident in 2009. He's highly educated, has no criminal record, pays his taxes, and works two jobs to support his family. He also regularly attends his church, donates to charity, and sits on the board of a local health club. Yet shortly after he applied for naturalization, he unlawfully voted in the presidential election. As a result, U.S. Citizenship and Immigration Services denied his citizenship application. He seeks review under 8 U.S.C. § 1421(c).

To be eligible for citizenship, Olaifa must establish good moral character. *See* 8 U.S.C. § 1427(a)(3). But the applicable regulation requires a finding that he lacks good moral character if—absent extenuating circumstances—Olaifa's unlawful vote adversely reflects upon his moral character. *See* 8 C.F.R. § 316.10(b)(3)(iii). He says

---

* Secretary of the Department of Homeland Security Alejandro Mayorkas is automatically substituted as a defendant. Fed. R. Civ. P. 25(d).

that he made an honest mistake and that the totality of the circumstances demonstrates that he has good moral character. The government moves for summary judgment and argues that Olaifa's unlawful vote precludes his naturalization for now.

The undisputed facts show that Olaifa's unlawful vote reflects more negatively than positively on his moral character, and he has not provided evidence to suggest that extenuating circumstances lessen the seriousness of his unlawful vote. Because Olaifa's act is a net negative, it reflects adversely on his moral character and the government's motion is granted. Despite this seemingly harsh result, Olaifa can try again. His unlawful act precludes a finding of good moral character only as long as it falls within the statutory period (five years). That clock expires in a matter of months, and nothing bars Olaifa from reapplying and establishing good moral character then.

## I.     Legal Standards

Summary judgment is proper when there is no genuine dispute of any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). I construe all facts and reasonable inferences in favor of Olaifa, the nonmoving party. *Robertson v. Department of Health Services*, 949 F.3d 371, 377–78 (7th Cir. 2020). But the moving party is entitled to summary judgment when the nonmoving party fails to make "a sufficient showing on an essential element" of his case for which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.    Facts

### A.    Olaifa's Background

Olaifa is a native and citizen of Nigeria. He has been a lawful permanent resident since January 2009, when he and his then-five-year-old daughter came to the United States on a diversity-lottery visa. [72] at 13, ¶¶ 1–2.[1] Olaifa's wife was denied a visa under then-applicable regulations because she was HIV positive. *Id*. ¶ 3.[2] But, to provide better educational opportunities for their daughter, the family decided that Olaifa and his daughter would move to the United States anyway. *Id*. ¶ 4. Olaifa's wife passed away in Nigeria in 2013. *Id*. at 15, ¶ 6.

Olaifa lives in Illinois with his daughter and sister (a U.S. citizen). Since 2009, Olaifa has been steadily employed, met all financial obligations, paid his taxes, and never been arrested or convicted of a crime. *Id*. ¶¶ 8–15.[3] He earned a surveying

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from the government's Local Rule 56.1 statement, [63], Olaifa's response, [72] at 1–13, and Olaifa's statement of additional material facts, *id*. at 13–21. Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3). I ignore legal arguments in the statements of facts and additional facts included in response to an asserted fact that do not controvert the asserted fact. *Id*. 56.1(d)(4), (e)(2). I also consider "other materials in the record" as appropriate. Fed. R. Civ. P. 56(c)(3).

[2] *See* Medical Examination of Aliens—Removal of Human Immunodeficiency Virus (HIV) Infection From Definition of Communicable Disease of Public Health Significance, 74 Fed. Reg. 56547 (Nov. 2, 2009) (codified at 42 C.F.R. pt. 34) ("As a result of this final rule [effective January 2010], aliens will no longer be inadmissible into the United States based solely on the ground they are infected with HIV.").

[3] The government objects to Olaifa's "self-serving affidavit." [79] ¶ 9. Although this is a common refrain in the government's response to Olaifa's additional facts, evidence can be self-serving and still be admissible. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) ("[A] self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts.").

degree from a Nigerian university, but Olaifa decided to pursue a career in healthcare in the United States (he began as a nursing assistant in 2009, and later became a registered nurse after receiving a nursing degree). *Id.* ¶¶ 10, 12–13; [63-3] at 20. From 2009 until late last year, Olaifa worked at a healthcare facility in Burnham, Illinois. [72] at 15, ¶ 15. He's currently a nurse at a Chicago hospital and recently began a second job cleaning commercial offices after his nursing shifts. *Id.* at 15–17, ¶¶ 14, 16. Olaifa is also active in the community. He regularly attends his church and donates money to its weekly collections, and he is on the board of a local health and fitness club. *Id.* at 17, ¶¶ 17–19.[4]

## B. Olaifa's Naturalization Application

In May 2016, after more than seven years as a lawful permanent resident, Olaifa applied for citizenship. [63] ¶ 3. Olaifa, who has been fluent in English since childhood, completed the application without an attorney; in it, he affirmed that he had never claimed to be a U.S. citizen, registered to vote, or voted in a federal, state, or local election. [72] at 3, ¶¶ 3–5.[5] Olaifa read these questions and now understands

---

[4] The government also says that these background facts are irrelevant and therefore inadmissible at trial under Federal Rule of Evidence 401. These facts are relevant to Olaifa's moral character and I consider them when deciding whether there are disputes of material fact on the application of 8 C.F.R. § 316.10(b)(3)(iii) to Olaifa's naturalization petition. *See* USCIS Policy Manual, Volume 12, Part F, Chapter 2, https://www.uscis.gov/policy-manual/volume-12 (current as of March 10, 2021) (listing as relevant to moral character assessments: family ties and background, criminal history or lack thereof, education, employment history, meeting financial obligations, and community involvement).

[5] Olaifa responded to the facts in the government's summary-judgment memorandum, [61] at 2–4, instead of its Local Rule 56.1 statement, [63]. Despite this error, there is significant overlap between the government's statement and the fact section of its brief, so Olaifa's response and admission to these facts is apparent from the record.

that they suggest that non-U.S. citizens are not allowed to vote, but he says he was not paying attention at the time. [63] ¶¶ 26–27; [63-5] at 145:2–16.

The next month, while at the DMV to update his state ID, Olaifa registered to vote. [72] at 5, ¶ 7. Olaifa told an Illinois DMV employee that he wanted to change the address on his state ID cards. *Id.* ¶¶ 9–10. She collected his cards and asked if he would like to register to vote; when Olaifa replied yes, she passed him a one-page voter registration application with an "X" marking the signature line. *Id.* ¶¶ 11–12; [63-6] at 2. The top of the application warned, in bold capital letters: "YOU MUST BE A U.S. CITIZEN TO USE THIS FORM." [63-6] at 2. Just above the signature line, a box was checked "yes" following the statement "I swear or affirm that ... I am a citizen of the United States" and "[i]f I have provided false information, I may be fined, imprisoned, or if I am not a U.S. citizen, deported from or refused entry into the United States." *Id.*[6]

Olaifa has maintained that he neither read the voter registration form nor checked any boxes on it (he says he marks boxes with an "X," not the checkmark that appears on the form). [63-8] at 4; [63-5] at 93:13–21, 105:12–106:3; [69-1] at 5, ¶ 17. While Olaifa would have understood the form's terms at the time, he says that he did not read the document he signed. [63-5] at 104:14–106:3, 122:8–125:20. In any event, Olaifa handed the signed form to the employee for processing. [72] at 7, ¶ 16. He never

---

[6] Olaifa says that these facts about the form are disputed because he "has consistently maintained that he did not read the form he signed." [72] at 5–7, ¶¶ 13–14. But Olaifa does not dispute that his signature appears on the form. The government's description of the form is accurate, and Olaifa's failure to read the form does not create a factual dispute over the form's content.

informed her that he was not a U.S. citizen. *Id.* ¶ 15. Nor did she ask whether he was a citizen. *Id.* at 19, ¶ 26.

A couple of months later, Olaifa received a voter registration application receipt in the mail. *Id.* at 7–9, ¶ 17; [63-5] at 107:3–22. Under a section labeled "IMPORTANT INFORMATION," the single-page receipt clarified that "[t]his application does not confirm your eligibility to vote." [63-7] at 2. It also provided a phone number to contact for missing voter registration cards, which Olaifa called (he never received one). [63-5] at 125:22–127:15. On the call, he did not mention his citizenship status or ask about his eligibility to vote. *Id.* at 127:9–15. In fact, while Olaifa claims that he was unaware that only citizens could vote, at no point did he ask anyone about eligibility requirements—or try to look them up on his own—before voting. *Id.* at 116:15–19, 127:16–24.

Olaifa voted in the 2016 presidential election. [72] at 9–11, ¶¶ 18, 21. When he arrived at the polling place, one of the poll workers asked for Olaifa's state identification; he presented his driver's license but did not inform anyone at the polling station that he was not a citizen (again, he was not asked). *Id.* at 9–11, 19, ¶¶ 19–20, 32. No one at the polling place knew that Olaifa was not a citizen. [63-5] at 136:1–12. And no public official or poll worker told Olaifa that he could vote as a non-U.S. citizen. [63] ¶¶ 12–14.

Despite receiving warnings on his application for naturalization, the voter registration form, and the receipt, Olaifa says that he first learned of the citizenship requirement while reading a civics booklet on the day of his naturalization interview

6

in December 2016. [63-8] at 6. At the same time, Olaifa followed the news on a daily basis leading up to the election, had studied the U.S. government in his GED program and in college, and knew when he voted that a person must be 18 years old to vote. [72] at 11, ¶¶ 24–25; [63-5] at 59:22–61:9. He also began studying for his citizenship test before voting in the election. [63-10] at 3.[7]

But Olaifa assumed that the DMV and polling-station employees had checked his eligibility to vote. [69-1] at 5, ¶¶ 18–19. Because he had provided his passport on a prior visit to the DMV, he believed that the officials had access to centralized government records of his immigration status and voting eligibility. [72] at 17–19, ¶¶ 22–24; [63-8] at 7. When immigration officials asked Olaifa during the naturalization process about his vote in the election, Olaifa confirmed—and did not try to conceal—that he had voted. [72] at 21, ¶ 37; [63-4] at 2; [63-8] at 4–6.

The agency issued a final administrative denial of Olaifa's naturalization application in June 2018. [63] ¶ 4; [63-4] at 4. It determined that "despite any misunderstanding made on [Olaifa's] part, [he was] not entitled to register to vote or vote in a federal election." [63-4] at 3. The agency concluded that Olaifa failed to establish that he is a person of good moral character because he violated federal law when he registered to vote and voted in the election. *Id*. at 4.

---

[7] The government contends that Olaifa knew that citizens could not vote because he began studying for his citizenship exam before voting. While the fact that he began studying before the election has been conclusively established, *see* [63-9] at 3; [49], this fact does not establish that he completed his studies or studied voting requirements.

### III.    Analysis

#### A.    Jurisdiction and Standard of Review

The court has jurisdiction to review the denial of Olaifa's application de novo. *See* 8 U.S.C. § 1421(c) (judicial review is de novo and "the court shall make its own findings of fact and conclusions of law"); *Klene v. Napolitano*, 697 F.3d 666, 669 (7th Cir. 2012) (Section 1421(c) confers right to an "*independent* ... judicial decision").

#### B.    Good Moral Character: Statutes and Regulations

The applicant bears the burden of establishing eligibility for naturalization. *See Bijan v. United States Citizenship & Immigration Services*, 900 F.3d 942, 945 (7th Cir. 2018) (citing *Berenyi v. District Director, INS*, 385 U.S. 630, 636–37 (1967)). Courts must ensure "strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship" because "Congress alone has the constitutional authority to prescribe rules for naturalization." *Fedorenko v. United States*, 449 U.S. 490, 506 (1981). The applicant must prove each requirement for naturalization by a preponderance of the evidence. *See* 8 C.F.R. § 316.2(b).

This case implicates only one of the requirements for naturalization—whether Olaifa "has been and still is a person of good moral character" during the statutory period (i.e., five years before the date he filed his application until the oath of allegiance). 8 U.S.C. § 1427(a)(3); 8 C.F.R. § 316.10(a)(1). Congress has determined that applicants lack good moral character if they engage in certain conduct or are convicted of certain crimes during the statutory period; the statute lists aggravated felons, smugglers, polygamists, illegal gamblers, and habitual drunkards, to name a

8

few. *See* 8 U.S.C. § 1101(f)(1)–(9). The list is not exhaustive and the statute contains a catchall provision stating that an applicant may lack good moral character for "other reasons." *Id*. § 1101(f). Congress left it to the Department of Homeland Security (and its predecessor agency) to identify those reasons. It did so in 8 C.F.R. § 316.10, and courts defer to its interpretation. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44 (1984); *United States v. Suarez*, 664 F.3d 655, 660–61 (7th Cir. 2011) (according *Chevron* deference to § 316.10).

Under the regulation, the agency evaluates an applicant's moral character "on a case-by-case basis taking into account the elements enumerated in this section and the standards of the average citizen in the community of residence." 8 C.F.R. § 316.10(a)(2). Like the statute, the regulation does not define what constitutes good moral character, but instead largely details what it is not. Applicants convicted of murder (ever) or aggravated felonies (after a certain date) can never establish good moral character. *Id*. § 316.10(b)(1). Those who, within the statutory period, engage in other conduct or are convicted of the crimes identified in 8 U.S.C. § 1101(f) lack good moral character. 8 C.F.R. § 316.10(b)(2); *see also United States v. Dang*, 488 F.3d 1135, 1139 (9th Cir. 2007) (noting that § 316.10(b)(1)–(2) restates the same categories as the statute). The regulation contains its own catchall provision, however. An applicant lacks good moral character if, during the statutory period, he "committed unlawful acts that adversely reflect on [his] moral character," unless he "establishes extenuating circumstances." *Id*. § 316.10(b)(3)(iii).[8] A conviction within the statutory

---

[8] Olaifa does not argue that the regulation requires more than one unlawful act. Courts consistently interpret the regulation to prohibit naturalization if the applicant committed

period is not necessary, so long as the applicant committed the offense during that time. *See Suarez*, 664 F.3d at 661.

### C.      Olaifa's Moral Character

The government argues that Olaifa's unlawful vote prevents him from establishing good moral character under 8 C.F.R. § 316.10(b)(3)(iii).[9] Olaifa counters that because his conduct does not fall under any of 8 U.S.C. § 1101(f)'s express categories, the agency (and now the court on de novo review) must assess his character under the totality of the circumstances. *See* USCIS Policy Manual, Volume 12, Part F, Chapter 2, https://www.uscis.gov/policy-manual/volume-12 (current as of March 10, 2021) ("In general, an officer must consider the totality of the circumstances and weigh all factors, favorable and unfavorable, when considering reformation of character in conjunction with [good moral character] within the relevant period."). The relevant factors weigh heavily in favor of a good moral character finding, says Olaifa, and the agency erred in not analyzing the totality of the circumstances.

No balancing of factors can occur if Olaifa lacks good moral character as a matter of law. The statute does not expressly prohibit people who illegally vote from

---

just one unlawful act that adversely reflects on his moral character. *See, e.g., United States v. Dave*, 652 Fed. App'x 468 (7th Cir. 2016); *United States v. Teng Jiao Zhou*, 815 F.3d 639, 645 (9th Cir. 2016); *see also United States v. Hsu*, 695 Fed. App'x 393, 397 (10th Cir. 2017).

[9] The agency also determined that Olaifa lacked good moral character because he illegally registered to vote. *See* [63-4] at 4; 18 U.S.C. § 1015(f) (felony for a noncitizen to "knowingly make any false statement or claim that he is a citizen of the United States in order to register to vote or to vote"). The government does not argue that Olaifa knowingly claimed he was a citizen; instead, it bases its summary-judgment motion solely on his unlawful vote.

naturalization, but the statutory text is only step one. The next step—and the key one here—is whether the regulation dictates that an applicant lacks good moral character. *See Suarez*, 664 F.3d at 660–61 (agency's "discretion is cabined by the mandatory language ... '[a]n applicant *shall* be found to lack good moral character'" (quoting 8 C.F.R. § 316.10(b))). Tasked with implementing a statute that endorses "other reasons" to preclude a finding of good moral character, the agency issued a regulation that defined one other reason to be the commission of unlawful acts that adversely reflect on the applicant's moral character. *See* 8 U.S.C. § 1101(f); 8 C.F.R. § 316.10(b)(3)(iii). This reasonable regulation carries the force of law. Therefore, the critical issues in this case are whether Olaifa's vote constitutes (1) an unlawful act committed during the statutory period, (2) that adversely reflects upon his moral character, and if so, (3) whether he can establish extenuating circumstances.

Olaifa committed an unlawful act within the statutory period. There is no dispute that he voted in the presidential election as a noncitizen. That is a crime. *See* 18 U.S.C. § 611. Olaifa does not assert a legal defense to the unlawful act. His complaint alluded to a possible official-authorization defense, but that defense is available only if he made "complete and accurate representations to a public official and then receive[d] permission from that official, when acting within the scope of his or her authority." *Fitzpatrick v. Sessions*, 847 F.3d 913, 915 (7th Cir. 2017). Olaifa's complaint alleged that he told a polling officer he was only a permanent resident, and that officer gave him permission to vote. *See* [1] ¶ 13. But he now acknowledges that he did not fully disclose his citizenship status and that no one at the DMV or polling

11

station knew he was not a citizen or told him he could vote as a noncitizen. [63-4] at 136:1–12. Accordingly, the defense is unavailable here. The statutory period spans from exactly five years before the date an applicant files until he swears the oath of allegiance. *See* 8 C.F.R. § 316.10(a)(1). Olaifa voted after he filed his application, so the act was within the statutory period.

The next question—whether Olaifa's illegal vote adversely reflects on his moral character—is more difficult. The regulation does not define what it means to "adversely reflect on moral character," nor have courts extensively developed the term. While crimes involving moral turpitude preclude a finding of good moral character under the statute, *see* 8 U.S.C. § 1101(f)(3), an unlawful-voting misdemeanor is not such a crime. In other words, Olaifa's unlawful act is not "conduct that shocks the public conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general." *United States v. Valenzuela*, 931 F.3d 605, 608 (7th Cir. 2019) (quotation omitted) (criminal sexual abuse of a minor is crime of moral turpitude).

Still, an unlawful act can adversely reflect on moral character without rising to the level of a crime involving moral turpitude. *See United States v. Hsu*, 695 Fed. App'x 393, 396 (10th Cir. 2017) ("Even if the person's conduct does not qualify as a crime involving moral turpitude ... he may still be found to lack good moral character [under 8 C.F.R. § 316.10(b)(3)(iii)]."). Little analysis is required when there is overlap with crimes expressly identified in the statute or it is otherwise obvious that a criminal act adversely reflects upon moral character. *See Suarez*, 664 F.3d at 657 (two

12

controlled-substances felonies, which also likely fell under 8 U.S.C. § 1101(f)(3), adversely reflected on moral character); *see also United States v. Dave*, 652 Fed. App'x 468, 470 (7th Cir. 2016) (aggravated criminal sexual abuse of a minor); *United States v. Salem*, No. 19-CV-2729, 2020 WL 6273478, at \*9 (N.D. Ill. Oct. 26, 2020) (fraud crimes—which are also crimes involving moral turpitude). When things are not so clear, courts take a closer look at the circumstances of an unlawful act "on a case-by-case basis taking into account ... the standards of the average citizen in the community of residence." 8 C.F.R. § 316.10(a)(2); *see also Hsu*, 695 Fed. App'x at 396; *Ampe v. Johnson*, 157 F.Supp.3d 1, 19, 21 (D.D.C. 2016). Olaifa argues that he prevails under this standard because average Illinois citizens generally lack knowledge about American history.[10] From this Olaifa infers that, like him, an average citizen in the community would not know much about voting requirements, so unlawful voting does not reflect poorly on his character. The government, on the other hand, says that Olaifa's ignorance of the citizen-voting requirement borders on deliberate and his vote adversely reflects on his moral character.

For starters, illegal voting is an offense capable of adversely reflecting on one's moral character. Unlike other misdemeanor or petty offenses, unlawful voting is connected to the civic virtue of participatory democracy and therefore has a moral

---

[10] Olaifa requests judicial notice of the average citizen's ignorance based on a February 2019 Woodrow Wilson Foundation nationwide survey. A court may judicially notice facts not subject to reasonable dispute because they are generally known or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The findings of one survey do not create a commonly known fact beyond reasonable dispute. The survey is also inadmissible and unauthenticated hearsay. Fed. R. Evid. 801.

component.[11] The right to vote is among the primary privileges conferred upon new citizens. Voting laws protect the integrity of this right, and in turn, the legitimacy of our republic. Indeed, confidence in the integrity of our electoral processes is central to our political order and "voting is of the most fundamental significance under our constitutional structure." *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). Acts that subvert the electoral process therefore undermine confidence in public institutions. The treatment of unlawful voting in other immigration contexts is also instructive. Although not subject to steep criminal penalties under 18 U.S.C. § 611, noncitizen voters face harsh immigration consequences as a result of such conduct; for example, they become inadmissible and subject to removal. *See* 8 U.S.C. § 1182(a)(10)(D)(i); 8 U.S.C. § 1227(a)(6).[12]

---

[11] To avoid surplusage, not every unlawful act falls within the parameters of § 316.10(b)(3)(iii). Olaifa's case does not require me to draw a precise line to distinguish unlawful acts that do not adversely reflect on moral character from those that do. But as the agency's policy manual acknowledges, "mere technical or regulatory violations may not be against the standards of an average member of the community." USCIS Policy Manual, Volume 12, Part F, Chapter 5. The statute books and code of federal regulations likely contain examples: under current Food and Drug Act regulations, it can be a crime punishable by up to one year in prison to sell a frozen cherry pie if more than fifteen percent of the cherries are blemished. 21 U.S.C. §§ 343, 331, 333 and 21 C.F.R. § 152.126(b)(1)(ii). Abandoning a fish at the United States National Arboretum is punishable by up to thirty days in prison. 40 U.S.C. § 1315(c)(2); 7 C.F.R. § 500.10; *see also* Mike Chase, *How to Become a Federal Criminal* (2019).

[12] The government signals that it will sensibly forgo removal and allow Olaifa to reapply for naturalization after the statutory period lapses. *See* [78] at 10 ("Although [Olaifa] ... is ineligible as a matter of law to naturalize today, he may reapply for naturalization this year. ... Defendants' motion for summary judgment does not seek to bar him permanently from naturalizing.").

Against this backdrop, the undisputed facts here demonstrate that Olaifa's illegal vote adversely reflects on his moral character. Olaifa received several written warnings that would have put the average citizen in the community on notice that he was ineligible to vote. Olaifa is highly educated and has been fluent in English since childhood. Before voting, he read and was capable of understanding the questions on his application for naturalization and his voter registration receipt. He likewise does not dispute that he could have read and understood the single-page voter registration application, which warned in large type that only citizens were eligible to complete it. Nothing was buried in small print or difficult to understand. And although he claims that he did not check the boxes affirming that he was a citizen, he could have read and understood that part before signing the form, too. *See Kimani v. Holder*, 695 F.3d 666, 671 (7th Cir. 2012) ("[P]eople are bound by what they sign whether or not they read it."). But despite these plain warnings and Olaifa's ability to understand them, he says he either did not read or was not paying attention to them. He also never asked anyone or researched whether he could vote.

At bottom, the problem is not that Olaifa lacked knowledge of voting requirements. Olaifa's unlawful act unfavorably reflects on his moral character because he did not do what an average citizen in the community would have done to comply with the law: read clear warnings on the legal documents he signed, look up the rules on the internet, or ask someone for help. A basic search would have confirmed his ineligibility. *Fitzpatrick*, 847 F.3d at 915 ("Even a cursory search would have turned up the rule against an alien's voting in a federal election."). Further,

Olaifa "is well educated and understands English; it is not too much to ask that [he] find out before voting whether an alien can cast a ballot in a federal election." *Id*. Although he has lived a productive, commendable life in general, his unlawful act does not reflect positively on his character. Nor is it neutral.

Olaifa has also failed to raise a genuine issue of material fact showing extenuating circumstances. Extenuating circumstances "must pertain to the reasons showing lack of good character, including acts negating good character, not to the consequences of these matters." *Suarez*, 664 F.3d at 662 (quoting *United States v. Jean-Baptiste*, 395 F.3d 1190, 1195 (11th Cir. 2005)). When present, such circumstances "render a crime less reprehensible than it otherwise would be, or 'tend to palliate or lessen its guilt.'" *Id*. (quoting *Black's Law Dictionary* (6th ed. 1990)). Olaifa's actions after voting and concerns about consequences are not extenuating circumstances, because they do not "pertain to his culpability" for the crime "and its negative impact on his moral character." *Jean-Baptiste*, 395 F.3d at 1195.

Olaifa has offered no evidence or argument to show extenuating circumstances that mitigate his guilt for illegally voting. His truthful disclosure after the fact and that this appears to have been a one-time offense do "nothing to mitigate [its] seriousness." *Suarez*, 664 F.3d at 662. And even if he did not know that it was illegal to vote, that does not diminish his guilt for the offense (which does not require willfulness), or counter the reasons showing lack of good moral character. *See Kimani*, 695 F.3d at 669 ("No surprise, then, that the only appellate decision on the subject holds that a conviction under § 611(a) does not depend on proof that the alien knew

that voting is forbidden." (citing *United States v. Knight*, 490 F.3d 1268 (11th Cir. 2007))). "[S]tatements such as 'I didn't read the form carefully' or 'I didn't think this through before acting' or 'I didn't understand the legal significance of what I was doing' may be explanations, but they are not excuses." *Fitzpatrick*, 847 F.3d at 915. Olaifa's failure to pay attention and the passive acquiescence of the DMV and poll workers are not extenuating circumstances.

## IV.    Conclusion

In sum, Olaifa cannot establish good moral character as a result of his illegal vote in the 2016 presidential election. The undisputed material facts show that he committed an unlawful act, it adversely reflects on his moral character, and no extenuating circumstances lessen his culpability. But as noted at the outset, the bar is only temporary and Olaifa can reapply when the statutory period lapses later this year. At that point, Olaifa's unlawful vote will become but one factor to be considered in determining whether he has good moral character. For now, though, he is ineligible for citizenship. The government's motion for summary judgment, [61], is granted. Enter judgment and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date:  March 18, 2021

17